## WILLIAM S. TAYLOR v. ANN MARIA BRAY.

1. A grandparent cannot take land in this state of which her grandson died seized, under a claim of inheritance by virtue of the sixth section of the statute of descents.
2. The rule of the common law, that the inheritance could not lineally ascend, has, by the statute referred to, been modified, so as to let in the father, and, to some extent, the mother, but it has not been abolished.
3. In calculating the degrees of consanguinity, by force of this sixth section, the rule of the civil, and not that of the common law, is to be used. *Per* BEASLEY, *Chief Justice.*
4. The designation, "several persons of equal degree of consanguinity," in this section means that class of collaterals who are nearest in degree to the person dying seized. *Per* BEASLEY, *Chief Justice.*
5. If there be but one collateral in the degree nearest to the person dying seized, such collateral will take the whole estate; thus, a single uncle or aunt will take in preference to, and in exclusion of several cousins.

This was an action for an alleged breach of covenant in a deed of conveyance, made by the defendant to the plaintiff. The covenant in question was, that the defendant, at the date of said deed, was seized in his own right of an absolute and indefeasible estate of inheritance, in fee simple, in the land conveyed. The case was certified to this court from the Circuit Court of the county of Monmouth.

For defendant, *J. Parker.*

For plaintiff, *B. Williamson.*

The opinion of the court was delivered by

BEASLEY, C. J.   This case comes before us on a certificate from the Circuit Court of the county of Monmouth, asking the advisory opinion of this court. The single point thus presented is, whether a grandmother can take land of which her grandson died seized, by force of the sixth section of the statute of descents. *Nix. Dig.* 214.*   The grandson died in-

* *Rev.*, p. 298, ? 6.

testate, without issue, and without leaving a brother or
sister of the whole or half blood, or the issue of any such
brother or sister, and without leaving a father or mother.
The insistment is, that the defendant, being the grandmother,
and thus the next of kin to the decedent, is entitled to the
inheritance, by virtue of the clause of the statute above indi-
cated. The language of the section thus appealed to is as
follows: " When any person shall die seized of any lands,
&c., without devising the same in due form of law, and with-
out leaving lawful issue, and without leaving a brother or
sister of the whole blood or half blood, or the issue of any
such brother or sister, and without leaving a father or
mother capable of inheriting, by this act, the said lands, &c.,
and shall leave several persons, all of equal degree of con-
sanguinity to the person so seized, the said lands, &c., shall
descend and go to the said several persons, of equal degree of
consanguinity to the person so seized, as tenants in common,
in equal parts, however remote from the person so seized the
common degree of consanguinity may be, unless," &c.

It will be at once observed, that the foregoing clause ap-
plies, in terms, to the juncture of the existence of "several
persons, all of equal degree of consanguinity to the ancestor;"
and, consequently, it was argued, that the case of the sur-
vivorship of a single grandparent could not be embraced
within the operation of the act. The notion was, that the
inheritance would go to a class, but not to an individual. But
I am not willing to adopt this theory. Such a construction
would be much too narrow and inflexible, for it would so re-
strict the scope of the act as to defeat, in other respects,
what I consider the clear statutory intent. Such a close
adherence to the letter of the law would also lead to this
result: that while it would exclude from the inheritance a
single grandparent, it would admit two or more grandparents,
for if we are to rely implicitly on the phraseology, then,
incontestably, a grandfather and grandmother surviving a
grandchild, would, on failure of the enumerated kindred, be
entitled to the estate; they obviously answer to the descrip-

Taylor v. Bray.

tion of "several persons, of equal degree of sanguinity to the person" dying seized; but the letter of the act must not be permitted to defeat the spirit. The admission to the inheritance of two grandparents, and the exclusion of one, on the same contingency, would be a result which we can scarcely suppose was contemplated when this act was framed. But, besides this, on this sheer verbal construction, a single collateral heir, as an aunt or an uncle, although the nearest in blood would be debarred from the inheritance equally with a single grandparent. Thus, for example, if there were but a single uncle surviving, and the children of deceased aunts and uncles, as such an event would not be comprehended in the very words which we find in this law—unless we are prepared to pass the uncle by, and go to the cousins, who are more remote—the consequence would be, the estate would descend as at common law, that is, by the rule of primogeniture, and the preference of the male line; but this, I think, has never been understood to be the true reading of this section, The language which is used is, unfortunately, inapt and ambiguous, and a strict interpretation involves many absurdities; as we cannot, therefore, be guided by the words, we must look mainly to the reason and design of the law. It appears to me, the evident policy pervading this section is, to give the estate equally to the nearest collateral kindred. That it was the design to transfer the estate to those collaterals who were next in degree of consanguinity to the person dying seized, I think, is perfectly evident; for, let us suppose the case of several surviving aunts and uncles, and several surviving cousins : in such event, it will be perceived, we have two classes of persons, precisely fulfilling the statutory designation; but it is presumed that no one will contend that it was the purpose to pass by the aunts and uncles, and give the estate, by way of preference, to their issue. In the entire scheme of our laws upon this subject, there is a clear recognition of the natural right inherent in propinquity in blood, and there is no example of such right being disregarded. We have no difficulty, therefore, in con-

cluding that it was the purpose to prefer those who stand in the nearer generation, to those who are embraced in one more distant. Surviving uncles and aunts will take, as a class, before, and in exclusion of surviving cousins. The design, to this extent, appears to be so clear, that it excludes all reasonable doubt. And, by a similar train of reasoning, we reach the further conclusion, that the section in question not only bestows the estate on the class of relatives next to the person dying seized, but also gives it to a unit of such class, that is to say, for example, if a single uncle or aunt survives, he or she will inherit, rather than cousins, the children of deceased uncles or aunts. This latter inference is drawn from the reflection, that it cannot rationally be supposed, that if an uncle or aunt should survive, having two or more children, it was the purpose that such children should have the estate, for the sole reason that they belong to a class comprehending several persons, while their parent is excluded on account of his or her unity. The received, and, as it seems to me, the proper construction of this sixth clause is, that it gives the estate to the nearest collateral kindred; if there be more than one survivor in that class, then to such survivors equally; if but one survivor, to that one wholly. The result, however, can only be attained by enlarging, through implication growing out of the evident legislative design, the language which has been employed. I do not think, therefore, that the claim of the defendant in this case should be rejected, on the plea that the case of a single grandparent surviving does not constitute the event on which the clause in question becomes operative, provided, as in the instance of a single collateral, an intention to vest the estate in such single grandparent is apparent; for, under such circumstances, upon the plainest rules of construction, the intention thus manifest, however incompatible with the mere verbal expression of the act, should be effectuated by the court. The substantial question, therefore, is, does such an intention appear?

No person can approach the examination of the subject to

which this interrogatory relates, without at once perceiving, that in order to place themselves in a position to claim the benefits of this sixth section, grandparents, and all others in the direct upward line, have an obstacle to surmount, which does not lie in the way of the collateral kindred. It was one of the well known rules of the common law, regulating the descent of lands, that the inheritance should never lineally ascend; before we can yield, therefore, to the claim of the defendant, we must be satisfied that this legal maxim has been abrogated in the state. And, as it cannot be pretended that this result has been effected by any express enactment, the consequence is, if any such repeal exist, it must be found in the implications necessarily arising out of the laws appertaining to this subject, considered in connection with the ancient rules which regulated the succession to lands.

The first statute relating to this subject is the act of the twenty-fourth of May, 1780. *Pamph. Laws* 43. Prior to that date, inheritances in this state devolved in accordance with the artificial maxims and customs of the feudal system. By this act lands were distributed, on the death of an ancestor, leaving two or more sons or issue, both male and female, among such issue, male and female, in the proportion that each son took two shares, each of such shares being equal to the share of a daughter; and if a child died before the ancestor, leaving issue, such issue was to represent the parent. The second section provided, in the event of an ancestor dying without issue, for brothers and sisters and their issue, who were to take in the manner and proportion between male and female, directed by the first section of the act. The third section related to the half blood.

The end in view, which led to the enactment of this law, is too plain to admit of the least doubt. Its office was, so far as concerned the objects to which it extended, to do away altogether with the canon of primogeniture, and to mitigate the severity of the rule which favored the male over the female stocks. Such was the manifest design,

judging from the context, and the preamble also contains a clear indication to the same effect; its language is: "Whereas, the law of descents, as it now stands, works injustice, by vesting the whole real estate of an ancestor in the heir-at-law, if a male, to the exclusion of the other issue or descendants, both male and female, of such ancestor, for remedy whereof," &c. I think, therefore, that it may be assumed, that in this act there is no intimation of a design to dispense with that regulation of the common law, which prevented the inheritance from passing upwards in the direct line.

The statute next in the order of time, is that of the fifth of February, 1816, *Pamph. Laws* 7; and this, extending the principle of the former act, abolishes altogether the preference of the male over the female stocks. Its provision is, "that from and after the fourth day of July next, whenever any person who is lawfully seized or possessed, or entitled to any real estate in his or her own right, in fee simple, within this state, shall die intestate, leaving two or more heirs lawfully entitled to the same, such real estate shall descend to, and be inherited by, his or her heirs, whether male or female, lineal or collateral, in equal shares or proportions."

This act, it is obvious, puts the males and females, as successors to their ancestors, on a level; there is no exhibition of a purpose beyond this.

On the fifteenth of February, 1816, another act regulating the descent of lands was passed, which made further provision with regard to the half blood, but which throws no additional light on the present topic.

After these acts, followed the general statute to direct the descent of real estate, enacted the twenty-ninth of January, 1817, *R. L.* 608, and into this law was, for the first time, introduced a clause similar to the section which has given rise to the present controversy. It has been before remarked, that in the legislation antecedent to this last enactment, we find no trace of a purpose to abolish, or, in any degree, to qualify the rule of the ancient law, which precluded the lineal ancestors from the inheritance. In this statute last

cited, the general disposition made of the inheritance was as follows: first, it was given to the children equally, and to their issue; then, on failure of these, to brothers and sisters equally, and to their issue. Posthumous children were also provided for. And then the fourth, and, for the present purpose, the important section, enacted as follows: "That when any person shall die seized of any lands, tenements, or hereditaments, as aforesaid, without devising the same in due form of law, and without leaving lawful issue, and without leaving a brother or sister of the whole blood, or any lawful issue of any such brother or sister, leaving a father, then the inheritance shall go to the father of the said person so seized, in fee simple, unless the said inheritance came to the person so seized from the part of his or her mother by descent, devise, or gift, in which case it shall descend as if such person so seized had survived his or her father." In the next and fifth section, the half blood is provided for; and in the sixth section, we find the general provision before mentioned, which gives, as in the act now in force, the estate, on failure of the enumerated kindred, to the several persons who are in equal degree of consanguinity to the person dying seized.

In view of the general scope and nature of the plan here exhibited, I think it is clear, that this law did not do away with the canon which was a bar to the lineal ascent of the estate. The rule is evidently modified, but as evidently, it is not abolished, for it is impossible to construe the several sections rationally on any other hypothesis. From the above recital of the fourth section, it appears that on failure of the lineal issue, and brothers and sisters of the whole blood, and their issue, the estate was cast upon the father, provided it did not come from the side of the mother. The first observation which this regulation suggests is this: that if it had been contemplated to let in any of the other ancestors of the deceased in the direct line, such design would probably have appeared in this clause. The section, intrinsically considered, seems to show that the rule was to be altered but in a single

Taylor v. Bray.

particular, that is, in favor of the father. But when we collate this clause with the sixth section, the inference above expressed, that the father is the only lineal ancestor who was qualified to inherit, becomes strengthened into demonstration, for unless this be the correct interpretation, then we have this anomalous consequence—that although the father, as the statutory heir to his child, was restricted to inheritances not derived from the side of the mother; on the other hand, the mother would have taken, by force of this sixth clause, without any restriction whatever. Thus, if the person seized had died without the enumerated relatives, and without leaving a father capable of inheriting, then, on the assumption that the sixth section abolished the rule which disqualified the ancestors in the direct line from claiming the land, the consequence was, the mother, under the sixth clause, as the next of kin, would have taken the inheritance, even though such inheritance had descended from the side of her husband, provided there had been none of the blood of the husband who could inherit. This result, so inconsistent with popular sentiments, and with the whole history of our legislation on this subject, no person skilled in the law, as it seems to me, will be willing to contend was ever designed. We reject, as we would anything inconsistent with a self-evident proposition, a construction which embodies as a part of the law of descents, a preference of the mother over the father as the successor to their child.

Nor does the supplement of the 29th of January, 1838, (*Pamph. Laws* 85,) lend any support on the side of the argument in favor of the defendant. This act devolves the estate, in case of the failure of the enumerated heirs, and if no father survives, on the mother for life, and this also, I think, is a mere modification and not an abolition of the rule in question. For if the rule be abolished, then we have this state of affairs: by the supplement, to which reference is just made, the mother, by express provision, may acquire by descent, an estate for life in the land of which her son died seized, while under the sixth clause, after the expiration of

VOL. III.                    M

this life estate, the grandmother, if the only surviving grandparent, will take the fee, and this, too, although the inheritance came from the side of her husband, and not from any one related to her by blood, provided there is no one of the paternal blood capable of inheriting. So, upon the same assumption, an inheritance derived from the maternal line may pass in fee to the paternal grandfather. And, in fact, if this theory be correct, that the rule that the estate cannot ascend in the direct line, does not exist, then, I do not perceive why, in some cases, the grandfather may not claim the estate, as the successor of his grandson, during the life of the father. For illustration, suppose the estate descends from the maternal line, and the son died seized without issue and without brothers or sisters, or the issue of such, and without any of the maternal blood capable of inheriting, but leaving a father and paternal grandfather, in this event, as the estate came from the side of the mother, by the express words of the act the father is excluded, but upon the hypothesis of the defendant in this case, what is to hinder the paternal grandfather from claiming as the next in degree of consanguinity? If the sixth section, as is contended, conveys the estate in this case to the defendant, then, in the instance supposed, the right of the paternal grandfather would appear to be indisputable. But this doctrine, which would exclude the father and admit in the same line the grandfather, could only be introduced into the law by the force of express enactment, couched in such clear terms as to leave no doubt as to the legislative will. My conclusion is that the claim of the defendant to the premises in dispute as the next in consanguinity, by force of the clause of the statute above criticised, is unfounded, and must be rejected. Until this case, I think it may be said that no person has ever heard of a grandparent claiming land in this state under an alleged right of inheritance from a grandchild. The cotemporaneous exposition has certainly been opposed to such a theory, and, in a matter affecting the title to real estate, such exposition is entitled to great weight

Taylor v. Bray.

with this court. It is proper to remark, before leaving the subject, that the above construction of the sixth section of the statute of descents, with regard to the exclusion of grand-parents, is supported by the authority of Chancellor Kent. 4 *Com.* 407, *note a.*

It will be observed, that in the course of the above obser-vations it is assumed that in the application of the sixth section of the statute commented on, the degrees of consan-guinity are to be reckoned by the rule of the civil, and not by that of the common law. I am aware that formerly there was some uncertainty on this subject, but the opinion of the profession appears to have become settled in favor of the method just indicated. Such method has received the ap-proval of Chief Justice Green. *Nix. Dig.* 215, *note.* The op-posite doctrine is attended with consequences which appear to forbid imperatively its adoption. If we were to assume the common law mode of calculating the degrees of consan-guinity, this would be the result; in case of surviving aunts and uncles, and children and grandchildren of such aunts and uncles, we would go back to the common ancestor, the grandfather, and thus these three generations would stand in the same degree—that is, they would all be related to the deceased grandson, who is supposed to have died seized, in the second degree. So cousins, the children of deceased aunts and uncles, being by force of this rule as near of kin as living aunts and uncles, would be entitled to share the estate equally, *per capita,* with such aunts and uncles. This incongruity has occasioned, and, as it seems to me, rightly, the rejection of the common law method of computation, and the adoption of that of the civil law.